THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DELILAH A. GRAHAM-SMITH and      :
RODNEY SMITH,[1]                     : CIVIL ACTION NO. 3:17-CV-239
                                 : (JUDGE MARIANI)
        Plaintiffs,               : (Magistrate Judge Saporito)
                                 :
        v.                          :
                                 :
CITY OF WILKES-BARRE, et al.,      :
                                 :
        Defendants.            :

## MEMORANDUM OPINION

Presently before the Court is a Report and Recommendation ("R&R") (Doc. 80) by

Magistrate Judge Joseph F. Saporito, Jr., in which he recommends that Defendants "John

Does 1-10" be dismissed from this action *sua sponte* pursuant to Rule 21 of the Federal

Rules of Civil Procedure, Defendants' motion for summary judgment (Doc. 51) be

granted, and the case be closed.  Plaintiffs filed objections to the R&R disagreeing with

the determination that summary judgment should be granted.  (Doc. 80.)  For the reasons

discussed below, the Court agrees.

## I. BACKGROUND

Magistrate Judge Saporito provided an extensive factual background which the

Court adopts but does not repeat here.  (*See* Doc. 80 at 1-5.)  Rather, in the discussion

---

[1] On May 4, 2021, Defendants filed the Suggestion/Statement of Death pursuant to Federal Rule of
Civil Procedure 25 stating that "the death of Delilah A. Graham-Smith . . . during the pendency of this action
is noted upon the record."  (Doc. 106 at 1.)

which follows, the Court will include background relevant to the issues raised by

Plaintiffs' objections.  By way of brief summary,[2] the event giving rise to Plaintiffs'

Complaint took place on February 10, 2015, when Wilkes-Barre police received a report

that a minor child, A.S., allegedly had been abducted and kidnapped from the Holy

Redeemer High School parking lot and had been communicating with her sister, Andrea

Siejna, by text message.  A.S. said she had been taken against her will by Delilah

Graham-Smith and was being held in the bathroom of Ms. Graham-Smith's house.

Andrea contacted the police, and Defendant Matthew Smith was sent to investigate.

Officer Smith first met with Andrea who showed him the text messages from her

sister which led him to believe that A.S. was being held at 45 Mallery Place, Plaintiffs'

home.  He proceeded to that location where he was met by three other officers,

Christopher Mortensen, Jacob Kaluzny, and Mitchell Rennick.  After knocking on the

front door and receiving no response, three officers went to the rear of the house and

knocked on the back door where their knocks were again unanswered.  To help

ascertain whether A.S. was in the house, Officer Smith asked Andrea, with whom he was

in cell phone contact, to ask her sister to make a noise if she was in the house.

Moments later, all three officers testified that they heard what they described to be

_____

[2] Unless otherwise noted, the summary is derived from R&R's Factual Background.  (Doc. 80 at 1-5.)

banging or tapping on a metal pipe. Upon hearing this noise, the officers forcibly entered the house and conducted a search but did not find A.S.

The officers subsequently made contact with Dylan Smith, Plaintiffs' adult son, at 41 Mallery Place. Although Dylan is deaf, mute, and partially blind, he was able to communicate with Officer Smith in writing and informed him that he and his mother resided at 41 Mallery Place. Officer Smith sought permission to search the house from Dylan which was granted. When A.S. was not found at 41 Mallery Place, Dylan also granted permission to search the adjacent 39 Mallery Place. Again, A.S. was not found.

Officer Smith eventually made contact with A.S. who admitted that she had lied about being abducted. A.S. apparently made up the story to cover for an unauthorized absence from school.

Plaintiffs filed their Complaint on February 9, 2017, naming the following defendants: the City of Wilkes-Barre; Matthew Smith, (sued in his individual capacity); Robert Hughes, the former chief of police for Wilkes-Barre (sued in his individual and official capacity); and John Does 1-10, a number of unidentified Wilkes-Barre police officers. (Doc. 1.) The Complaint contains four counts. In Count I, Plaintiffs assert that the February 2015 search of their properties by police was unreasonable and unlawful in violation of their rights under the Fourth and Fourteenth Amendments made actionable by 42 U.S.C. § 1983. In Count II, Plaintiffs assert 42 U.S.C. § 1983 municipal and

3

supervisory liability claims against the City and Police Chief Hughes based on their failure to train or supervise the individual police officers involved in the allegedly unlawful search of Plaintiffs' properties that gave rise to this action. In Count III, Plaintiffs assert a § 1983 First Amendment retaliation claim based on prior litigation by Plaintiffs against the City of Wilkes-Barre, a different police officer, and a former police chief. In Count IV, Plaintiffs assert state-law tort claims for invasion of privacy and intentional infliction of emotional distress.

On April 21, 2017, Plaintiffs filed a stipulation of dismissal with respect to certain claims. (Doc. 12.) They stipulated to the dismissal of the Fourteenth Amendment due process claim in Count I, all § 1983 claims against former police chief Hughes in Count II, and all state-law claims in Count IV. (*Id.* at 1.) Following Plaintiffs' stipulation, the following claims remained: (1) the Fourth Amendment unreasonable search claims in Count I; (2) the § 1983 municipal liability claim in Count II; and (3) the First Amendment retaliation claim in Count III. On July 23, 2019, following the close of discovery, Defendants filed a motion for summary judgment on the plaintiffs' remaining claims. (Doc. 51.)

Plaintiff filed objections to the R&R on April 15, 2020. (Doc. 97.) Defendants filed a brief in opposition to the objections on April 27, 2020. (Doc. 98.) Plaintiffs did not file a reply brief.

## III. STANDARD OF REVIEW

## A. Report and Recommendation

A District Court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of certain matters pending before the Court. 28 U.S.C. § 636(b)(1)(B). If a party timely and properly files a written objection to a Magistrate Judge's Report and Recommendation, the District Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id*. at § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3); M.D. Pa. Local Rule 72.3; *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). "If a party does not object timely to a magistrate judge's report and recommendation, the party may lose its right to *de novo* review by the district court." *EEOC v. City of Long Branch*, 866 F.3d 93, 99-100 (3d Cir. 2017). The *de novo* standard applies only to objections which are specific. *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984). However, "because a district court must take some action for a report and recommendation to become a final order and because the authority and the responsibility to make an informed, final determination remains with the judge, even absent objections to the report and recommendation, a district court should afford some level of review to dispositive legal issues raised by the report." *Id*. at 100 (internal citations and quotation marks omitted).

## B. Summary Judgement

Summary judgment is appropriate "only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under the governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a

6

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

In reviewing the evidence, "[i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Federal Rule of Civil Procedure 56(c)). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## II. ANALYSIS

Plaintiffs object to the R&R's recommendation that Defendants' motion be granted on three grounds. First, Plaintiffs maintain that the R&R incorrectly determined that Defendants satisfied their burden on summary judgment with a *prima facie* showing that the officers had probable cause to justify a warrantless search of 45 Mallery Place. (Doc. 97 at 2.) Second, Plaintiffs contend, contrary to the findings in the R&R, that the consent searches of 39 and 41 Place were invalid because Officer Smith could not have reasonably believed that Dylan Smith, Plaintiffs' son who provided consent, was capable of providing voluntary consent for the warrantless search. (*Id.* at 10.) Third, Plaintiffs assert that the

R&R incorrectly found that Plaintiffs failed to establish a causal link between the filing of their previous lawsuit and the warrantless search. (*Id.* at 13.)

## A. Search of 45 Mallery Place

Plaintiffs' objection to the warrantless search of 45 Mallery Place is based on their assertion that whether "an individual inside Plaintiffs' home was in imminent danger [is] a disputed material fact" in that "a factual dispute exists as to whether the officers actually heard the sound in response to their instructions to A.S. to make a noise." (Doc. 97 at 3, 4.) Upon *de novo* review of this issue, the Court agrees with the R&R that Plaintiffs have not shown a genuine issue of material fact regarding the basis for the warrantless entry into 45 Mallery Place.

With the objection, Plaintiffs do not take issue with the legal framework set out by Magistrate Judge Saporito as to the Fourth Amendment's right of the people to be free from unreasonable searches and seizures (Doc. 80 at 14-15).

> "Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996) (quoting *Payton v. New York*, 445 U.S. 573, 587 (1979)). "To search a person's home and belongings, police officers ordinarily must first seek a warrant based on probable cause supported by oath or affirmation." *Id.* "Warrantless searches . . . are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion." *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006). In defining exigent circumstances, the Supreme Court has identified four factors that justify a warrantless intrusion into a person's home: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; or (4) the risk of danger to the police or other persons inside or outside the dwelling. *See Minnesota v. Olson*, 495 U.S. 91, 100 (1990). It is the fourth factor that is at issue in this case. "If the officers have

9

probable cause to believe an individual in the home is in imminent danger, they may enter it without a warrant." *United States v. Wood*, 542 Fed. App'x 208, 212 (3d Cir. 2013) (citing Parkhurst, 77 F.3d at 711).

(Doc. 80 at 14-15.)

Although Plaintiffs maintain that "a factual dispute exists as to whether the officers actually heard the sound in response to their instructions to A.S. to make a noise" (Doc. 97 at 4), the basis for the assertion amounts to a "conclusory statement[] that a factual issue exists," *Anderson*, 477 U.S. at 248, which is not sufficient to defeat Defendants' motion. Plaintiffs hypothetically contend that the three officers who testified that they heard a noise could have "simply produced a conveniently fabricated account of events or artifice created to permit them to enter Plaintiffs' residence without proper authorization." (Doc. 97 at 4.) Referring to Defendants' statements as "self-serving," Plaintiffs contend that the R&R's finding that Defendants had come forward with sufficient evidence to demonstrate that exigent circumstances existed "clearly demonstrates a failure to comprehend the dubious nature and value of this evidence and fails to appreciate the obvious potential and incentive for fabrication of the statements by Defendants." (Doc. 97 at 4.)

While Plaintiffs reject the characterization of their argument as merely raising "metaphysical doubt" (*id.* at 4 (quoting Doc. 80 at 18)), they do not come forward with any "specific facts showing a genuine issue for trial," M*atsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Other than their totally unsupported hypothetical scenario, Plaintiffs point to no evidence which undermines the three officers' consistent

testimony on this issue. Plaintiffs do not elaborate upon the "obvious potential and incentive for fabrication" allegedly associated with the officers' statements nor does the evidence of record show that the portrayal is appropriate.

Officer Smith and Sergeant Mortensen acknowledged at their depositions that they did not have probable cause before they heard the noise which had been requested but, given the circumstances, probable cause and exigent circumstances to enter without a warrant occurred simultaneously when they heard the noise in response to their request. (Smith Dep. 105:13-106:16, 108:15-109:16, Doc. 51-9 at 28-29; Mortensen Dep. 35:1-24, Doc. 51-10 at 10).) This testimony indicates a measured approach to the investigation and actions taken at the house which notably included officers taking a specific step to ascertain the need to enter the house after their knocking on the doors went unanswered. The established sequence of events undermines Plaintiffs' unsupported suggestion that the officers fabricated their account of events so they could enter without a warrant (Doc. 97 at 4).

Further, no suggestion of impropriety on the part of the officers can be gleaned from the deposition testimony of the only person who had contact with them during the relevant time, A.S.'s sister Andrea Siejna. Plaintiffs do not dispute that Ms. Siejna had cell phone contact with Officer Smith and she texted the request to make a noise to A.S. No evidence of record indicates that she identified any irregularities or inconsistencies in the officers' approach to the investigation of her sister's reported abduction. Plaintiffs provide only a

portion of her deposition, but it shows that Ms. Siejna was concerned enough to call 911 upon learning from A.S. that Plaintiff Delilah Graham-Smith had taken her from the school parking lot and was holding her against her will. (Andrea Siejna Dep. 21:15-22:11, Doc. 74-6 at 3-4.) Ms. Siejna also testified that she or her mother did not consider contacting Plaintiff Graham-Smith because, she explained, "she has done, like, a lot of things to my family that this incident wasn't surprising, so I did not want to – I was scared that she might do something crazy if she had my sister. . . . Like take her where – even take her away somewhere that I don't know the location." (*Id.* 23:17-24:7, Doc. 74-6 at 23-24.)

Plaintiffs also assert that "differing inferences are possible even as to those facts which are not disputed" such as whether officers reasonably perceived that Plaintiff Graham-Smith posed a significant threat to A.S.'s safety. (Doc. 97 at 5.) Again, Plaintiffs point to no evidence to support their assertion.

Finally, Plaintiffs seek to distinguish two cases cited in the R&R, *United States v. Wood*, 5452 F. App'x 208, 212 (3d Cir. 2013), and *Byrd v. Duffy*, Civ. A. No. 96-0070, 1998 WL 961902, at *4 (E.D. Pa. Dec. 11, 2998). (Doc. 97 at 5-9.) While the facts of the cited cases may be distinguishable, the legal principle supporting those decisions--an objectively reasonable basis to believe that an individual inside was in danger and created exigent circumstances for a warrantless entry--supports the action in this case: officers received a report that a juvenile had been taken from the school parking lot against her will and was being held against her will, the officers' investigation supported the initial report, and the

noise heard in response to the request for A.S. to make a noise confirmed that she was in the suspected location although there had been no response to the officers' knocking on the front and back doors of the house. Given these circumstances, Magistrate Judge Saporito aptly pointed to the general principle set out in *United States v. Wayne*, 318 F.2d 205, 212 (D.C. Cir. 1963): "the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." (Doc. 80 at 17.) Despite Plaintiffs' position that *Wood* and *Byrd* presented different and more dangerous circumstances and the text messages from A.S. were "quite innocuous" (Doc. 97 at 7-9), Magistrate Judge Saporito properly found that the information available to the officers gave them probable cause to believe that an individual inside 45 Mallery Place was in imminent danger, justifying a warrantless search. (Doc. 80 at 16.)

## B. Search of 39 and 41 Mallery Place

Plaintiffs next object to the R&R's conclusion that they had failed to adduce any evidence tending to show that a genuine dispute existed with respect to whether Officer Smith could have reasonably believed that Dylan Smith was capable of providing voluntary consent to search 39 and 41 Mallery Place. (Doc. 97 at 10.) Upon *de novo* review of this issue, the Court agrees with the R&R that Plaintiffs have not shown a genuine issue of material fact regarding the reasonableness of Officer Smith's belief that Dylan provided the necessary consent to search 39 and 41 Mallery Place.

13

As stated in the R&R,

> "[i]t is axiomatic that a search based on the voluntary consent of a person whom an officer reasonably believes is authorized to give it is constitutional. Such consent grants officers the right to search any place over which they reasonably believe the consenting person exercises authority, and the scope of such consent is dictated by 'common sense.'" *United States v. Woodley*, 788 Fed. App'x 100, 101 (3d Cir. 2019) (citations and brackets omitted). To be valid, consent must be freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *see also United States v. Sculco*, 82 F. Supp. 2d 410, 420 (E.D. Pa. 2000) ("[O]ne need not waive one's Fourth Amendment rights knowingly or intelligently. One need only be acting voluntarily.") (citation omitted). "Consent is a question of fact determined from the totality of the circumstances." *United States v. Antoon*, 933 F.2d 200, 204 (3d Cir. 1991). Moreover, "[a]ll that the Fourth Amendment requires is that the law enforcement officer decide the issue of consent in a reasonable manner." *Sculco*, 82 F. Supp. 2d at 419–20.

(Doc. 80 at 23-24.)

In support of the objection that the Magistrate Judge erred in finding that there was no issue of material fact regarding whether Officer Smith had valid consent for the search of 39 and 41 Mallery Place, Plaintiffs point to Plaintiff Graham-Smith's testimony about her son's disabilities and Andrea Siejna's testimony regarding Dylan's appearance. (*Id.* at 10-11.) At her deposition, Ms. Graham-Smith verified that Dylan said that he consented to the officers' entry into 39 and 41 Mallery Place.[3] (Graham-Smith Dep. 82:10-12, Doc. 51-12 at 83.) Thus, the issue here is not whether Dylan technically consented to the searches but whether Officer Smith reasonable believed he had the capacity to do so.

---

[3] Earlier in her deposition, Ms. Graham-Smith said she had never asked him whether he gave permission to enter 39 and 41 Mallery Place on February 10, 2015. (Graham-Smith Dep. 42:13-20, Doc. 51-12 at 43.)

14

Officer Smith, the officer on scene who mainly interacted with Dylan, testified that,

although Dylan could not speak or hear, they were able to communicate through writing and

with signals. (Doc. 80 at 20-21 (citing Smith Dep. 118-120, Doc. 51-9 at 31).) The R&R

sets out extensive testimony on the issue, including Officer Smith's assessment that Dylan

did not seem intellectually impaired or disabled beyond his inability to speak (*id.* at 21 (citing

Smith Dep. 122-25, Doc. 51-9 at 32-33)) and Sergeant Mortensen's testimony that he did

not remember anything unusual about Dylan's facial appearance or ability to walk (*id.* at 22

(citing Mortensen Dep. 72-73, Doc. 51-10 at 19-20)). The R&R also provides the following

summary of evidence on the issue:

> the officers encountered Dylan Smith, the plaintiffs' adult son, outside the home
> where he resided at 41 Mallery Place. He was not supervised by a parent or
> other caretaker, and he had access (keys) to both properties. Although deaf
> and mute, he was able to communicate with officer Smith through hand
> gestures and written notes on a notepad; indeed, we note that it appears to
> have been Dylan who initiated communication with officer Smith. Other than
> his deafness and muteness, the officers observed no features or conduct that
> suggested to them a physical or mental disability that would prevent Dylan from
> providing voluntary consent to a search of the premises.

(Doc. 80 at 24.) Magistrate Judge Saporito concluded that "[t]he circumstances as

described by the officers at deposition do not suggest any coercion or duress. Based on the

evidence adduced by the defendants, there was nothing to place a reasonable officer on

notice that Dylan was incapable of providing voluntarily consent to the search" (*Id.* at 24-25

(citing *United States v. Richards*, 741 F.3d 843, 848 (7th Cir. 2014) (homeowner with

dementia provided valid consent where there was nothing to put a reasonable officer on

notice that homeowner's mental state was so impaired he could not provide voluntary consent to warrantless search); *Johnson v. Wild Acres Lakes Prop. & Homeowners Ass'n*, No. 3:07-CV-1384, 2009 WL 2426057, at *10 (M.D. Pa. Aug. 6, 2009) (driver suffering from a stroke provided valid consent where he remained lucid and coherent, such that police officer could reasonably believe that, although in need of medical attention, driver was capable of voluntarily consenting to a search)).)

The R&R also reviewed evidence proffered by Plaintiffs that Dylan was incapable of providing valid consent by virtue of his mental and physical disabilities. Ms. Graham-Smith testified that her son was "very incapacitated" and "his consent is invalid" because he had suffered "multisensory damage" as a result of congenital rubella syndrome. (Doc. 80 at 25.) She also said that, in addition to being deaf and mute, he was visually impaired due to the removal of one of his eyes, and he was autistic. (*Id.*) Magistrate Judge Saporito found that other than Ms. Graham-Smith's "testimony that Dylan 'looks ill,' the plaintiffs have adduced no evidence to suggest that a police officer who was not so familiar with Dylan's medical history as his mother would have reason to believe that he was incapable of providing voluntary consent to a search."[4] (Doc. 80 at 25-26.) He therefore concluded that, under the applicable objective reasonableness standard, Plaintiffs failed to adduce evidence

---

[4] When asked to describe in what way Dylan "looks ill," Ms. Graham-Smith said "It's very hard to describe. . . . I really can't, I can't describe how he looks ill." (Graham-Smith Dep. 43:15-21, Doc. 51-12 at 44.)

demonstrating a genuine dispute as to whether Officer Smith could have reasonably believed that Dylan was capable of providing voluntary consent. (*Id.* at 26-27.)

Plaintiffs now take issue with the R&R's conclusion that they did not produce sufficient evidence to create a genuine issue of material fact regarding Dylan's ability to consent to the search. (Doc. 97 at 10 (quoting Doc. 80 at 25-26).) The basis for the objection is that the R&R did not consider the testimony of Andrea Sienja on the issue:

> the Report fails to credit the valuable testimony of a disinterested, non-party witness, Andrea Siejna, who noted that Dylan's limitations are readily apparent upon a casual inspection. She stated, "[y]ou could tell that there is a possible, like, mental impairment." Andrea Siejna, Pls. Ex. F at 73, Doc. 74-6. Siejna further noted, [t]he way that his eyes look kind of a certain way . . . I would say his speech and mannerisms give that away." *Id.* at 74.[5]

(Doc. 97 at 11.) Based on the testimony of Ms. Graham-Smith and Ms. Siejna, Plaintiffs conclude that "a reasonable officer would not expect that Dylan Smith would be capable of giving valid voluntary consent." (*Id.*) With this conclusion, Plaintiffs do not attempt to reconcile Ms. Graham-Smith testimony that, although Dylan is able to verbalize only a few words, he is able to communicate with her through lip-reading and sign language, and he also knows how to write, which is how he communicated with officer Smith at the time of the search at issue." (Graham-Smith Dep. 42:4-6, 47:5-10, Doc. 51-12 at 43, 48.) Nor do they address how officers should have known by looking at Dylan that he was unable to give

---

[5] Ms. Siejna's testimony about Dylan is not found in Plaintiffs' cited exhibit. Plaintiffs' Exhibit F contains nine pages and ends with page 50 of Ms. Siejna's deposition transcript. (Doc. 74-6 at 9.) However, Defendants' Exhibit L, found in Documents 60 and 60-1, contains the entire transcript of Ms. Siejna's deposition, and the Court will reference Defendants' exhibit going forward.

consent when Ms. Graham-Smith said "I can't describe how he looks ill." *See supra* n.4

(quoting Graham-Smith Dep. 43:15-21, Doc. 51-12 at 44).

Regarding Ms. Siejna's description of Dylan's appearance, the Court disagrees that

it undermines the conclusion that there is no genuine dispute as to whether Officer Smith

reasonably believed that Dylan could have given valid consent to search 39 and 41 Mallery

Place. Like Ms. Graham-Smith, Ms. Siejna knew Dylan and was familiar with his

disabilities, in her case based on her friendship with his sister Eva. (Siejna Dep. 72:5-73:1,

Doc. 60-1 at 17-18.) At her deposition, the following exchange took place regarding Dylan's

disabilities:

> Q. When you first meet him having not known him, how does he appear?
>
> A. You could tell that there is a possible mental, like, impairment.
>
> Q. What about his appearance gives you that clue?
>
> A. Well, I would say – well, I mean, his – the way that his eyes kind of look a certain way, that I'm not – you know, like, I don't know. I – I would say more so his speech and mannerisms give that away.
>
> Q. All right. All right. Are you able to ask him a question?
>
> A. I could ask him one, but I could not interpret like – yeah, I couldn't hold a conversation with him.

(Siejna Dep. 73:21-74:9, Doc. 60-1 at 18-19.) Upon further questioning about her

relationship with Dylan and her observations of him, Ms. Siejna verified that she had only

met him a couple of times and had spoken with him "just briefly, hellos and . . . goodbyes."

(*Id.* 87:3-10, Doc. 60-1 at 32.)

Q. Have you ever seen him use a notepad?

A. Yes, yeah.

Q. Okay. And to communicate with you or to others?
A. To other people, yeah.

Q. You said that you would be unable to hold a conversation with [Dylan]?

A. Yes, a verbal one and also because I can't sign.

. . . .

Q. At any point – when other people, even though you may have difficulty conversing with him, were you, during your own personal observations, able to see him conversing and holding conversations with others?

A. Yes.

Q. Did you, during those times, did you see people speaking to him and him appearing to understand them?

A. Yes.

Q. And he was able to communicate back?

A. Yeah.

Q. Okay. And, again, you've seen him use a pad to write, to communicate with others?

A. Yes.

(*Id.* 87:11-19, 88:10-22, Doc. 60-1 at 32, 33.)

The foregoing dialog demonstrates that Ms. Siejna's testimony supports rather than

undermines Magistrate Judge Saporito's conclusion that Plaintiffs' proffered testimony does

not create a genuine issue of material fact regarding the reasonableness of Officer Smith's

determination that Dylan gave valid consent to search 39 and 41 Mallery Place. Though Ms. Siejna at first indicated that, upon meeting him, "[y]ou could tell there was a *possible* . . . mental impairment," follow up questions and responses clarified that her perceptions were based on his "speech and mannerisms" without specifying what mannerisms would be immediately observable. (Siejna Dep. 73:23-74:5, Doc. 60-1 at 18-19 (emphasis added).) Moreover, later questioning revealed that Ms. Siejna's assessment of Dylan's ability to communicate is consistent with that of Officer Smith: she had seen him successfully use a notepad to communicate with others and she had observed him have conversations with others, and she assessed that he was understood by those with whom he was communicating.

Consideration of Ms. Siejna's complete testimony concerning her assessment of Dylan's abilities shows that the excerpt of her testimony upon which Plaintiffs rely does not provide the suggested support for their objection. Her testimony about Dylan's ability to communicate supports that of Officer Smith, and her unsupported reference to Dylan's "mannerisms," similar to Ms. Graham-Smith's vague description Dylan's appearance, does not negate consensus on his communication abilities. Thus, insofar as Plaintiffs' objection regarding consent is based on the additional testimony proffered, the objection is without merit.

The Court further finds that the objection is also without merit to the extent it is based on Officer Smith's alleged failure to follow Defendant's General Order 1.2. (Doc. 97 at 12.)

General Order 1.2 provides that officers, before conducting a search of a property, should make every effort to have the person granting consent sign a Search and Seizure Consent Form, and, when the form is not used, the officer should provide "a detailed explanation in the incident report as to the circumstances and the reasons for not using the form, as well as the facts surrounding the voluntariness of the consent." (Doc. 74-8 at 1.) In the Incident Report, Officer Smith provided the facts surrounding the voluntariness though he did not provide an explanation of why he did not use the form. (Doc. 74-2 at 9-10.) Plaintiffs' speculation that following the procedure would have enabled the officers to determine whether Dylan had the capacity to search (Doc. 97 at 12) does not undermine the reasonableness of Officer Smith's assessment of Dylan's ability on the grounds discussed above. Plaintiffs' conclusory statement that the procedural breach "tends further to demonstrate that the officers failed to obtain valid voluntary consent from Dylan Smith before searching the Smiths' residence" (*id*.) is similarly without merit. As discussed above, consistent testimony about Dylan's ability to communicate was not meaningfully discounted by any evidence of record. Further, according to his mother, Dylan did in fact grant his permission to the search. *See supra* p. 14.

## C. First Amendment Retaliation Claim

Plaintiffs' final objection is that the R&R incorrectly determined that Plaintiffs failed to establish a causal link between the filing of their previous lawsuit and the warrantless search. (Doc. 97 at 13.) Upon *de novo* review of this issue, the Court agrees with the R&R

that Plaintiffs have not shown a genuine issue of material fact regarding the required causal link between the two events.

To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, "a plaintiff must prove that (1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link [existed] between the constitutionally protected conduct and the retaliatory action." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (internal quotation marks and citation omitted).

Magistrate Judge Saporito determined that Plaintiffs' First Amendment claim fails on the third element. (Doc. 80 at 29.)   Regarding the necessary causal link, the Third Circuit has recognized

> "that a suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation." *Thomas v. Town of Hammonton,* 351 F.3d 108, 114 (3d Cir.2003) (citing *Rauser v. Horn,* 241 F.3d 330, 334 (3d Cir.2001)). However, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* (quoting *Estate of Smith v. Marasco,* 318 F.3d 497, 512 (3d Cir.2003) (internal quotation marks omitted)). Moreover, we have generally recognized that the defendant in First Amendment Retaliation actions be aware of the protected conduct in order to establish the requisite causal connection. *See Ambrose v. Twp. Of Robinson,* 303 F.3d 488, 493 (3d Cir.2002).

*Hammond v. City of Wilkes Barre*, 628 F. App'x 806, 807 (3d Cir. 2015).

The R&R provides the following background to Plaintiffs' First Amendment claim:

> The plaintiffs claim that the warrantless search of their residential properties at 39, 41, and 45 Mallery Place was undertaken in retaliation for the exercise of

22

their First Amendment rights in bringing prior litigation against the City of Wilkes-Barre and a former police chief and another police officer, neither of whom is a party to this action.

In November 2014, the plaintiffs brought an unrelated civil rights action against the City of Wilkes-Barre, former police chief Gerard Dessoye, and police officer Alan Gribble. The action arose out of Graham-Smith's involvement in an automobile accident that occurred in November 2012. Graham-Smith apparently left the scene of the accident to seek assistance at a nearby bank. Officer Gribble apparently arrested Graham-Smith for leaving the accident scene and refusing to return to it. The plaintiffs brought false arrest, false imprisonment, and other claims against the City, its police chief, and officer Gribble. Although the police chief had already been dismissed from the action at the time of the search at issue in this case, the lawsuit remained pending before this Court. Shortly after the complaint in this action was filed, the Court granted summary judgment in favor of the City and officer Gribble, and the Third Circuit has affirmed that decision on appeal. *See Graham-Smith v. City of Wilkes-Barre*, No. 3:14cv2159, 2017 WL 1386232 (M.D. Pa. Apr. 18, 2017) (granting summary judgment), *aff'd*, 739 Fed. App'x 727 (3d Cir. 2018); *Graham-Smith v. Wilkes-Barre Police Dep't*, No. 3:14cv2159, 2015 WL 2384274 (M.D. Pa. May 19, 2015) (dismissing police chief).

(Doc. 80 at 27-28.)

Magistrate Judge Saporito reasoned that

Officer Smith did not know of the plaintiffs or their lawsuit against officer Gribble prior to the events of February 10, 2015. (Defs. Ex. E (Smith Dep.) at 29, Doc. 51-9, at 9.) Moreover, it is undisputed that the search of the plaintiffs' properties was predicated upon a report of an abducted teenager, A.S., who had expressly communicated to her sister by text message that she had been abducted and was being held against her will by one of the plaintiffs, Delilah Graham-Smith.

The plaintiffs argue that they have satisfied the third, causal-link element based on the fact that officer Smith merely knew officer Gribble, who may sometimes work the same shifts as Smith. But Smith hadn't even met Gribble until Smith moved from midnight-shift to day-shift in January 2015, a few weeks before the search at issue. (*Id.* at 30–34, 154, Doc. 51-9, at 9–10, 40.) In light of Smith's testimony that he knew nothing at all about the plaintiffs before the

search for A.S. on February 10, 2015, and in light of the clear existence of probable cause to search the Mallery Place properties based on A.S.'s statements that she was being held against her will by Graham-Smith at her home, this tenuous link to Gribble is simply too speculative to satisfy the causal link element of a First Amendment retaliation claim. *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment.")

(Doc. 80 at 29-31.)

Plaintiffs assert that the Magistrate Judge's conclusion on this issue is error because their retaliation claim is "premised on a material controverted issue of fact: whether Officer Smith and other officers knew about Plaintiffs' 2014 lawsuit against the Department" which is a factual dispute requiring a credibility determination best decided by a jury. (Doc. 97 at 13-14 (citing *Pellegrino v. U.S. Transp. Sec. Admin.*, Civ. A. No. 09-5505, 2014 WL 1498839, at *17 n.11 (E.D. Pa. April 16, 2014)).) With this argument, Plaintiffs disregard the details of the relationship between Officer Smith and Officer Gribble in February 2015, relying only on the fact that "Officer Smith was assigned to the same platoon as, and, at times worked with, Officer Alan Gribble" which they say "gives rise to a reasonable inference that Officer Smith knew of Plaintiffs and the prior lawsuit and could have formed an animus against them as a result of the lawsuit." (Doc. 97 at 13 (citing Pls. Ex. E at 30-34, Doc. 74-5; *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir. 1995) (noting the court must draw all reasonable inferences in favor of the non-moving party)).) However, given Officer Smith's testimony that he saw Officer Gribble from one

to four days a week in February 2015 and they never worked together before 2015 (Smith Dep. 31:13-32:8, 33:1-3, Doc. 51-9 at 9-10), no "reasonable inference" can be drawn that they had the kind of relationship that would undermine Officer Smith's credibility regarding his testimony that he knew nothing of Plaintiffs or their lawsuit before February 10, 2015 (Smith Dep. 29:7-16, Doc. 51-9 at 9) or that he acted solely in response to the circumstances presented on February 10, 2015.

Similarly, Plaintiffs' assertion that former police chief Gerald Dessoye had animus against them and, because he was the chief when Officer Smith joined the police force, his animus would have been known to Officer Smith either directly or through a supervisor (Doc. 97 at 14) is pure speculation from which no reasonable inference can be drawn. Notably, Officer Smith was not asked anything about former Chief Dessoye at his deposition and he provides no citation to support his speculative contact between them.

Having discounted the two grounds on which Plaintiffs' objection regarding their First Amendment claim is based, the Court concludes the objection is without merit. With this determination, the Court has found that Plaintiffs have not shown error on any basis alleged. Each of Plaintiffs' objections relies on testimony taken out of context and hypothetical scenarios which they claim undermine Defendants' testimony. However, Plaintiffs do not point to any evidence which presents a genuine issue of material fact on

relevant matters and they do not come forward with evidence from which negative credibility inferences can be drawn. Therefore, this is a case "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," *Scott*, 550 U.S. at 380, and Defendants' motion for summary judgment is properly granted.

### D. Plain Error

The Court finds no error in Magistrate Judge Saporito's determination that the John Doe Defendants are properly dismissed from this action pursuant to Federal Rule of Civil Procedure 21. (Doc. 80 at 13.)

The Court also finds no error in Magistrate Judge Saporito's finding that Defendant should be granted summary judgment on Plaintiffs' § 1983 claim against the City of Wilkes-Barre in Count II because Plaintiffs expressly conceded this claim in their brief in opposition to Defendants' motion. (Doc. 80 at 14.)

### IV. CONCLUSION

For the reasons set out above, the Court finds Plaintiffs' objections to the R&R (Doc. 97) to be without merit, the Court will adopt the R&R (Doc. 80), the Court will dismiss "John Does 1-10" pursuant to Federal Rule of Civil Procedure 21, and the Court will grant Defendants' motion for summary judgment (Doc. 51). A separate Order will be filed simultaneously with this Memorandum Opinion.

Robert D. Mariani
United States District Judge